```
               UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
                     WESTERN DIVISION
```

Michael Kravas and Kathy Kravas,    :   Case No. 1:10-cv-32
    Plaintiffs,                 :
vs.                                 :
Private Adoption Services, Inc.,    :
Carolyn Mussio and Terri Mussio,    :
    Defendants.                 :

**ORDER**

Before the Court is Defendants' motion for summary judgment. (Doc. 72)  Plaintiffs oppose the motion (Doc. 75), and Defendants have filed their reply.  (Doc. 77) For the following reasons, the Court will grant the Defendants' motion.

**FACTUAL BACKGROUND**

This case arises from Plaintiffs' failed attempt to adopt an infant.  Plaintiffs are residents of Pennsylvania.  Defendant Private Adoption Services ("PAS") is a private adoption agency in Cincinnati, Ohio.  Carolyn Mussio is its Executive Director, and Terri Mussio is a licensed social worker for the agency.  Both Carolyn and Terri are Ohio residents, and the infant was born in Ohio to Ohio residents.  Plaintiffs originally filed their complaint in the Pennsylvania state court.  Defendants removed the case on the basis of diversity, 28 U.S.C. §1441, and the

-1-

Pennsylvania district court subsequently transferred venue to this district.

According to Plaintiffs' complaint, Michael and Kathy Kravas wanted to adopt a child. A friend of theirs who lived in Ohio, Gina Smith, contacted them in January 2008, because Smith knew a young woman who was pregnant and wanted to place her baby for adoption. Kathy Kravas spoke to the young woman (whom the parties call the "Birth Mother") on the telephone for several hours, and they arranged to meet each other. Kathy met the Birth Mother and the Birth Father a short time later, and the expectant parents discussed their desire for an "open" adoption. They gave Kathy a sonogram of the baby, and told Kathy they wanted her to adopt the baby. Kathy and the Birth Mother were in weekly contact throughout the pregnancy, and Kathy and Michael attended some of the pre-natal examinations. The Birth Mother told the Kravas they were invited to witness the birth of the child.

The complaint further alleges that Plaintiffs contacted PAS in February 2008 to assist them in the adoption process. Carolyn Mussio told Plaintiffs that PAS charged a fee of $8,000 for the services, $4,000 payable as a retainer and the balance due at completion of the adoption. PAS also required Plaintiffs to secure a home study from a licensed organization, which Plaintiffs allege they obtained and provided to PAS. The complaint describes various telephone calls and meetings among

the parties on topics including payment of the hospital bills, and who would be present for the delivery.

The Birth Mother went into labor in late May, 2008, and the Birth Father subsequently informed Plaintiffs that the baby had been born. The Birth Mother had a Caesarean section and had to remain on the hospital for a few days. Plaintiffs allege that she told Plaintiffs she would call them when it was time for them to come and pick up the baby. Plaintiffs allege that no one from PAS was in contact with them about the birth. When Kathy Kravas complained about this, Terri Mussio called her and told her that custody of the child would be transferred to Plaintiffs on June 1. Plaintiffs traveled to Cincinnati on May 30, and received messages from the birth parents with pictures of the baby. But on Sunday, June 1, Carolyn Mussio called Plaintiffs and told them that the Birth Mother had changed her mind, and did not want Plaintiffs to adopt the baby.

Plaintiffs allege that the Birth Mother's brother, Matt (who was dating Gina Smith's daughter during all of these events) learned about this turn of events, and called his sister and asked her why she changed her mind. According to the complaint, the Birth Mother told Matt that "she had recently been told by PAS, Terri and/or Carolyn that Kathy [Kravas] had four felonies on her record, and that she had tried to adopt a baby unsuccessfully on two separate occasions. The Birth Mother also

stated that PAS, Terry and/or Carolyn told her that Mike wanted a dog, and not a baby." (Complaint ¶¶49-50) These statements were untrue. Kathy Kravas called Carolyn Mussio, who told her there was nothing she could do, and that PAS was working for the Birth Mother and not for the Kravases. This latter statement was contrary to Carolyn Mussio's earlier representation that PAS and Mussio were representing the Kravases.

Plaintiffs allege that PAS intentionally orchestrated a scheme to place the baby with different adoptive parents who were willing to pay PAS more money than the $8,000 fee that PAS charged to the Kravases. They allege that the Defendants intentionally thwarted the Kravases by making false and defamatory statements to the birth mother in order to coerce and manipulate her into changing her mind about her child's adoption. (Complaint ¶¶58-59) Plaintiffs' complaint includes claims for defamation, fraud, negligent infliction of emotional distress, and breach of fiduciary duty. They seek compensatory and punitive damages against the Defendants.

Defendants' motion for summary judgment argues that Plaintiffs' allegations lack factual support. They principally contend that Plaintiffs have failed to establish a genuine factual dispute about the Defendants' responsibility for the failed adoption.

**ANALYSIS**

Summary Judgment Standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253 (1968)).  The Court is not duty bound to search the entire record in an effort to establish a lack of material facts.  Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. den., Superior Roll Forming Co. v. InterRoyal Corp., 494 U.S. 1091 (1990).  Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute.  Anderson, 477 U.S. at 250.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the

material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

Cause of Plaintiffs' Injury

All of Plaintiffs' claims require them to establish that Defendants' actions, statements or omissions proximately caused them injury. The essential elements of a common law defamation claim are proof of a false and defamatory statement, an unprivileged publication of that statement to a third party; negligence by the publisher; and "either actionability of the statement irrespective of special harm or the existence of special harm **caused by the publication**." Akron-Canton Waste Oil v. Safety-Kleen Oil Servs., 81 Ohio App.3d 591, 601 (Ohio App. 1992) (internal citation omitted; emphasis added). Special harm need not be shown if a written statement falsely charges plaintiff with committing a crime, or an oral statement charges commission of a crime involving moral turpitude which subjects the offender to "infamous punishment." Id. (internal citations omitted). Neither of these situations exist here.

Similarly, a fraud claim requires evidence of plaintiff's justifiable reliance on a false representation that proximately caused injury to plaintiff. Burr v. Stark County Board of

Commrs., 23 Ohio St. 3d 69, 73 (1986).  A claim for infliction of emotional distress, whether negligent or intentional, requires evidence that the defendant caused the alleged emotional distress.  See, e.g., Powell v. Grant Med. Ctr., 148 Ohio App.3d 1, 5 (Ohio App. 2002).  And a breach of fiduciary duty claim requires, in addition to evidence establishing the fiduciary nature of the relationship, evidence that the breach of duty proximately caused injury to the plaintiff.  See, e.g., Grossniklaus v. Waltman, 2010 Ohio 2937, *5 (Ohio App. 2010) (internal citations omitted).

    The gravaman of all of Plaintiffs' claims is their allegation that Defendants made false and defamatory statements to the birth mother that caused her to change her mind about completing the adoption, and therefore proximately caused Plaintiffs harm.  Defendants argue that Plaintiffs have failed to establish a genuine factual dispute that anything the Defendants said or did caused that result.  Plaintiffs disagree, arguing in their opposition that the "undisputed testimony" in the record establishes that "Defendants acted in their own self interest and steered or directed the birthparents away from the Plaintiffs and directly toward another couple, all to the financial benefit of the Defendants. ... Had the Defendants represented the Plaintiffs as promised and worked on their behalf, the tragic events at issue would not have occurred."  (Doc. 75, Plaintiffs' Opposition

at 7)  The Court finds that the testimony in the record does not support Plaintiffs' assertions.

The Birth Mother testified in her deposition that, from the first time she met Plaintiffs until the time she went into the hospital to have her child, her initial good feelings about them changed "drastically."  She liked and thought positively of the Kravases when she first met them.  But over time, "... it just went downhill.  The more I knew about them and like talked to them, the more I didn't like them."  She believed that Kathy Kravas "wasn't in this for me and she wasn't my friend."  (Deposition at 12)  She recalled a complaint from Mrs. Kravas about paying her medical bills, and stated she felt that Kravas was "really pushy."  (Id. at 13)

The Birth Mother testified that she wanted her privacy when she delivered her child, and to have time to be alone with the baby.  She described a meeting with Terri Mussio to discuss her birth plan, and said that Gina Smith was also at the meeting.  She stated:  "I didn't feel comfortable, though, because Gina was there, and like they had already made a decision for me, you know, that Kathy was going to be in the room and Kathy was going to take the baby right away.  They had already decided that before they even asked me.  So I guess Gina was shocked when I said I didn't want anybody in the room."  (Id. at 19)  She did not like the fact that the Kravases made her feel as though she

should just hand the baby over to them right away.  (Id. at 14) She told the Kravases that she wanted an open adoption, and to be able to see the baby after the adoption; but as time went on, she felt like she was being excluded and that the Kravases were not going to honor her feelings.  (Id. at 15-16)

After the baby was born on May 28, she said that the Kravases were "texting" the birth father, asking when they could come and see the baby.  She "just didn't want anything to do with that right now" and wanted to rest, but she believed the Kravases kept pressuring the father.  Her own family visited her, and her mother told her that she did not want the Kravases to adopt the baby, but her father urged her not to change her mind.  She told her father that it didn't feel right to let the adoption happen.  (Id. at 21-22)

Two hospital social workers met with the birth mother and father during the hospital stay.  Tracy Jones met with the couple under normal hospital procedure, in what Jones described as a standard conversation she would have with all birth parents.  She recalled the birth mother telling her that she felt as if she was being pushed by the potential adoptive parents into leaving the hospital early.  (Snyder Deposition at 10-11) Snyder did a follow-up visit the next day, and the birth mother refused to sign any hospital paperwork concerning her discharge or releasing any rights to the baby.  (Id. at 12-13)  The next day, a second

hospital social worker, Elizabeth Strotman, visited the birth mother and asked how she felt about the adoption.  The birth mother said she was confused and felt pressured.  Strotman assured her that she did not have to proceed with the adoption, that she could choose another family, and that she had "other options."  The birth mother testified that this was the first time she ever heard from anyone that she had "other options," and that she felt relieved after this conversation.  She told Strotman that she did not like the way the Kravases treated her through the pregnancy, and Strotman told her that she could choose another couple.  The birth mother testified: "After I talked to her I decided that I was going to choose a different couple.  And it was totally my decision. ... [T]he social worker at Good Sam, she pretty much let me know that I had a choice, because before then I didn't feel like I had a choice."  The birth father thought that it "would be too hard to choose another couple right now," but she disagreed, telling him "I'm going to do this.  Like it was my decision completely. ... I felt like I had already like to [sic] committed to everything, and everything was already set and done.  That's how I felt.  And it was an awful feeling.  But once I realized that I did have a choice still, I started feeling a lot better."  (Birth Mother Deposition at 23-24)

    Elizabeth Strotman's testimony confirms the birth mother's.

-10-

Strotman said that the couple told her they were having second thoughts about the adoptive parents, and whether they were a good match. She encouraged the couple to consider what it was that they were looking for in adoptive parents, to "... contact their agency and see if they could find another family that fit that list, criteria, needs, along those lines. I just wanted to empower her with her role in this decision, as it was her child." (Strotman Deposition at 15)

After she reached this decision, the birth mother asked PAS and Carolyn Mussio for information about other potential adoptive couples. She read the materials Mussio provided, along with her mother and the birth father, and was "... trying to kind of just block out the whole Kathy and Mike thing because, you know, I started getting harassed at that point. ... I started getting phone calls first from my brother trying to - I guess they were - you know, he got thrown in the middle of this." Her brother asked her "why are you changing your mind, just asking me questions that I didn't even feel like answering. I didn't feel like I needed to answer. Like I already made up my mind. It's like they couldn't take no for an answer, because they kept bugging my brother ... putting him on the spot, like making him like ask me questions." (Birth Mother Deposition at 26-27) She chose another couple from the materials Defendants provided, and asked Carolyn to contact the couple. She testified that no one

from PAS suggested or recommended any of the couples described in the materials.  She was also specifically asked if anyone from PAS told her anything about the Kravases that made her change her mind about the adoption, and she responded: "No.  In my head I already - I think I already had my mind made up for a long time, I just didn't acknowledge that yet.  Like I had that bad feeling all along, and I just ... didn't feel like I had a choice.  And then I started getting support from my mom and my gynecologist. ... I finally got enough courage to say - especially after I talked to the social worker at the hospital, ... I finally got up enough courage to say, you know what, I want to go with somebody else." (Id. at 30-31)  She expressly denied that anyone from PAS coerced her into changing you mind.  She said that the couple who ultimately adopted her baby was "definitely my choice."  (Id. at 38)

The birth mother testified that she learned that Kathy Kravas had a criminal record, but she was not sure how she learned of that.  She was certain that she found out **after** she had already changed her mind about the adoption.  (Id. at 48-49)

The Birth Father testified that he talked with the birth mother about her concerns about the Kravases, and that he shared some of her complaints.  He said that "... we just didn't feel like it was what we had thought it would be."  (Birth Father Deposition at 13)  He felt that Mrs. Kravas was rude at times,

and inappropriately called the unborn baby "hers." He testified that he and the mother became acquainted with a nurse while they were in the hospital, and they had expressed some negative feelings to her about the Kravases. The nurse encouraged them to keep their options open and to speak with the hospital social worker. He testified that after the meeting with Strotman, they asked Carolyn Mussio to provide packets of information on other potential adoptive parents. He stated that at that point, he was "on the fence" about the Kravases, but that the birth mother wanted the change more than he did. He also testified that his role in the pregnancy "was just to be there for support. [The birth mother] made a lot of decisions." (Birth Father Deposition at 34-35) If the mother had decided to stay with the Kravases, he would have backed her decision, and he backed her decision to choose another couple.

The birth father testified that it was Mrs. Kravas who told them about her prior failed adoption at their first meeting. Kravas told them that she had made arrangements for another private adoption, but when the woman gave birth, she changed her mind and decided to keep the baby. The Kravases said they had been cautious about getting involved in another private adoption, and "getting their hopes up again." (Id. at 23) He also testified that Carolyn Mussio told them that Kathy Kravas had a criminal record. This occurred after Carolyn brought the packets

-13-

of information on other couples to the hospital, and they were telling Mussio why they decided to look for a different adoptive couple. During this conversation, the birth father told Mussio that the Kravases told him they had not had a home study done because they were concerned that their dog would be considered "too aggressive" around a child. When the father mentioned this to Mussio, she told the couple that she had no knowledge of any concern about dogs, but that Mrs. Kravas told Mussio that she did not want a home study done because of a prior criminal record, something involving shoplifting or credit cards. (Id. at 25-26) Plaintiffs do not dispute that Kathy Kravas in fact has a criminal record of three theft and credit card fraud charges, the most recent in 2004. The birth father also confirmed the mother's testimony that no one from PAS persuaded them to choose a different couple for the adoption, or steered them to any particular couple. He testified that the decision was left entirely up to him and the birth mother.

To oppose Defendants' motion, the Kravases rely on their allegations and the deposition testimony of Kathy Kravas and Gina Smith, that the birth mother changed her mind because PAS told her that Kathy Kravas had felony convictions (or "a horrible criminal record" as Kravas stated in her deposition), that she had prior failed adoptions, and that Mike Kravas wanted a dog instead of a baby. Neither Kravas nor Smith heard these

-14-

statements from the birth mother or from the birth father. After Kathy Kravas learned of the change-of-heart, she knew that the birth mother's brother, Matt, called his sister in the hospital and asked her why she had changed her mind. It was Matt who told Kathy Kravas and Gina Smith that his sister told him that the alleged false statements were made by Defendants, and were the reasons the birth mother changed her mind. The birth mother expressly denies making these statements to Matt. Matt was asked in his deposition if he recalled his sister telling him that Mrs. Kravas had felonies on her record. He testified that his sister told him "that the agency released information." He was then asked if he could remember exactly or specifically what his sister said, and he answered "not really" and "no." (Matt Bohan Deposition at 20) He admitted that he did not have any personal knowledge about what anyone said to his sister about Mrs. Kravas's criminal history. He also had no memory of his sister saying anything to him about Mr. Kravas wanting a dog, or about any prior adoptions. He testified that all he could remember "... is basically I believe information was given at the hospital from the agency that was either not supposed to be said, or something happened right at the last minute that made her change her mind, when she wasn't going to, because I spoke to her the day before and she was. So I - once again, I don't know what type of stuff was said, aside from the felony-type - or the

felony, but -". (Id. at 27) He did not talk to any of the Defendants about this issue, and he does not know who else may have given any information about the adoption to his sister.

Fed. R. Civ. P. 56(e)(2) provides that a party opposing a properly-supported summary judgment motion may not rely on their own allegations, but must come forward with admissible evidence setting forth specific facts showing a genuine issue for trial. The testimony of the birth mother is clear that nothing the Defendants did or failed to do proximately caused her to change her mind about the Kravases, or about the adoption of her child. While there are some differences between the testimony of the birth mother and the birth father, none of those differences are material to the critical issue of causation of Plaintiffs' injury, which was the loss of the adoption opportunity and the attendant emotional strains and distress described by Plaintiffs. Plaintiffs rely entirely upon their own allegations of what Matt told them that the birth mother told Matt that the Defendants told the birth mother. Aside from the obvious hearsay problems, Matt's sworn deposition testimony does not create a **genuine** dispute about the cause of the birth mother's change of mind. Matt also admitted that he could not really remember what his sister may have said to him in a telephone conversation. The birth father denied that Mussio told him or the birth mother that Kathy Kravas had felony convictions; Mussio told them that Kravas

had a criminal record involving shoplifting or credit cards, a statement that was true.  While Plaintiffs note that proximate cause is often found to be a jury question, the sworn testimony and admissible evidence in this case fail to demonstrate a genuine dispute on this issue that must be submitted to the jury.

In addition to causation, Defendants raise other arguments concerning the elements of Plaintiffs' claims.  In view of the Court's conclusion that Plaintiffs have not established a genuine dispute as to the cause of their injuries, which is dispositive of the entire complaint, the Court need not address these other arguments.

## CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment (Doc. 71) is granted.  Plaintiffs' complaint is dismissed with prejudice.

SO ORDERED.

THIS CASE IS CLOSED.

DATED: December 21, 2010	s/Sandra S. Beckwith
	Sandra S. Beckwith
	Senior United States District Judge